

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-07-353-CV**

MALCOLM BARBER AND LEANN                                    APPELLANTS
BARBER

V.

WILLIAM F. DEAN, M.D., MIKKO                                APPELLEES
PETER TAURIAINEN, M.D., AND
CARDIOVASCULAR AND
THORACIC SURGICAL GROUP
OF WICHITA FALLS, P.A.

------------

## FROM THE 30TH DISTRICT COURT OF WICHITA COUNTY

------------

## OPINION

------------

### I. INTRODUCTION

In three issues, appellants Malcolm Barber and Leann Barber appeal the trial court's order dismissing their health care liability claims against Appellees William F. Dean, M.D., Mikko Peter Tauriainen, M.D., and Cardiovascular and

Thoracic Surgical Group of Wichita Falls, P.A. ("CTSG"). *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b) (Vernon Supp. 2009). We will affirm in part and reverse and remand in part.

## II. FACTUAL AND PROCEDURAL BACKGROUND

According to Appellants' original petition and the expert report of Jeffrey Alan Wagner, M.D., M.B.A., in January 2004, Malcolm underwent a multivessel coronary artery bypass graft procedure involving the harvesting of his left radial artery, left saphenous vein, and left internal mammary artery. The surgery lasted over six hours. A "three team approach" was utilized during the harvesting procedure, and all three harvests were performed simultaneously. Dr. Tauriainen performed the harvest of the left internal mammary artery; Leo Mercer, M.D. performed the harvest of the left saphenous vein; and Shellie Barnett-Wright, PA-C performed the harvest of the left radial artery from Malcolm's left forearm. Dr. Dean, who was present in the operating room for a portion of Malcolm's surgical procedure, provided "medical/surgical" services to Malcolm. Following the harvesting, Malcolm's left arm was "tucked" by anesthesiologist Robert Moss, M.D., assisted by a couple of nurses.

Following the bypass graft procedure, Malcolm experienced difficulties with his left hand and arm, including pain, burning, numbness, inability to grip, stiffness, stinging, swelling, and weakness. He attempted to relieve these

2

difficulties through medical management and occupational therapy, but the treatments proved to be unsuccessful. An orthopedic surgeon diagnosed Malcolm with a left ulnar nerve lesion and ulnar cubital syndrome and recommended surgery to treat the conditions. Surgery to relieve these conditions was unsuccessful, and Malcolm continues to experience pain, weakness, grip difficulties, and other problems with his left arm and hand.

Appellants sued Appellees and others[1] alleging, among other things, that Malcolm's postsurgical problems were caused by Appellees' negligence in failing to provide medical or surgical care regarding Malcolm's left upper extremity condition during and after the surgical procedures. Throughout his report, Dr. Wagner characterizes Appellees' conduct as a failure to provide for the proper positioning and padding of Malcolm's arms and body to prevent perioperative peripheral neuropathies. Appellants alleged both direct and vicarious theories of liability against CTSG. They tendered Dr. Wagner's expert report within 120 days of suit.

---

[1] The other defendants included Dr. Mercer; Barnett-Wright; Dr. Moss, who placed Malcolm under general anesthesia for the procedure; and United Regional Health Care System, Inc., the hospital at which the surgery occurred. Dr. Mercer was the appellee in a separate appeal in which Appellants challenged the trial court's dismissal of their claim against Dr. Mercer for failure to comply with the civil practice and remedies code expert report requirements. *See Barber v. Mercer*, No. 02-08-00079-CV, 2009 WL 3337192 (Tex. App.—Fort Worth Oct. 15, 2009, no pet. h.).

3

Dr. Dean timely filed his objections to Dr. Wagner's report on the following grounds:

> (1) Dr. Wagner is not qualified to render an opinion about the accepted and applicable standard of care relevant to Appellants' claim; and
>
> (2) the report fails to sufficiently set forth (i) the applicable standard of care and (ii) how Dr. Dean failed to meet that standard of care.

Dr. Tauriainen timely filed his objection to Dr. Wagner's report on the ground that Dr. Wagner, an anesthesiologist, is not qualified to render an opinion about the standard of care applicable to a cardiovascular and thoracic surgeon. CTSG timely filed its objections to Dr. Wagner's report on the following grounds:

> (1) Dr. Wagner is not qualified to render an opinion as to whether CTSG breached any applicable standard of care; and
>
> (2) the report is insufficient to set forth (i) the applicable standard of care, (ii) how CTSG breached the standard of care, and (iii) how CTSG's alleged negligence caused Malcolm's alleged injuries.

Appellees also filed civil practice and remedies code section 74.351(b) motions to dismiss. After a hearing on Appellees' objections to Dr. Wagner's report and motions to dismiss, the trial court sustained Appellees' objections and dismissed Appellants' claims against Appellees with prejudice.[2]

---

[2] The trial court also denied Appellants' request for a thirty-day grace period to provide an amended expert report as to Appellees, but Appellants have not appealed that portion of the trial court's order.

4

### III. STANDARD OF REVIEW

We review a trial court's order on a motion to dismiss a health care liability claim for an abuse of discretion.[3] *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or if it acts without reference to any guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986)). We may not substitute our judgment for the trial court's judgment. *Id*. Nor can we determine that the trial court abused its discretion merely because we would have decided the matter differently. *Downer*, 701 S.W.2d at 242.

### IV. EXPERT REPORT REQUIREMENTS AND STANDARDS

Civil practice and remedies code section 74.351 provides that, within 120 days of filing suit, a plaintiff must serve expert reports for each physician or health care provider against whom a liability claim is asserted. Tex. Civ. Prac.

---

[3] In their first issue in this appeal, Appellants ask this court to conclude that abuse of discretion continues to be the proper standard of review following the recodification of the Texas Medical Liability Act in 2003. Appellees agree that the standard of review is abuse of discretion. In the absence of supreme court authority instructing otherwise, we have continued to apply the abuse of discretion standard and do so here. *See, e.g.*, *Maris v. Hendricks*, 262 S.W.3d 379, 383 (Tex. App.—Fort Worth 2008, pet. denied).

& Rem. Code Ann. § 74.351(a). An expert report is a written report by an expert that provides a fair summary of the expert's opinions regarding the applicable standard of care, the manner in which the care rendered by the physician or health care provider failed to meet the standard, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id*. § 74.351(r)(6). If a claimant timely furnishes an expert report, a defendant may file a motion challenging the report's adequacy. *See id*. § 74.351(a), (c), (*l*). A trial court must grant a motion to dismiss based on the alleged inadequacy of an expert report only if it finds, after a hearing, "that the report does not represent an objective good faith effort to comply with the definition of an expert report" in the statute. *Id*. § 74.351(*l*).

The information in the report does not have to meet the same requirements as evidence offered in a summary judgment proceeding or at trial, and the report need not marshal all the plaintiff's proof, but it must include the expert's opinions on each of the elements identified in the statute—standard of care, breach, and causation. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878–79 (Tex. 2001); *Thomas v. Alford*, 230 S.W.3d 853, 856 (Tex. App.—Houston [14th Dist.] 2007, no pet.). In detailing these elements, the supreme court has made clear that an expert report must provide enough information to fulfill two purposes if it is to constitute a good faith

6

effort: the report must (1) inform the defendant of the specific conduct the plaintiff has called into question and (2) provide a basis for the trial court to conclude that the plaintiff's claims have merit. *Palacios*, 46 S.W.3d at 879; *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 859 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A report does not fulfill these two purposes if it merely states the expert's conclusions or if it omits any of the statutory requirements. *Palacios*, 46 S.W.3d at 879. In assessing the report's sufficiency, the trial court may not draw any inferences; it must rely exclusively on the information contained within the report's four corners. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878.

Regarding qualifications, the civil practice and remedies code provides in relevant part that "expert" means the following:

(A)  with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401;

(B)  with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402; [and]

(C)  with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician

7

who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence.

Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(A)–(C).

Under section 74.401, a person may qualify as an expert witness on the issue of whether a physician departed from accepted standards of medical care only if the person is a physician who

> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

*Id*. § 74.401(a) (Vernon 2005). In determining whether a witness is qualified on the basis of training or experience under section 74.401(a)(3), the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim and (2) is actively practicing medicine in rendering medical care services relevant to the claim. *Id*. § 74.401(c).

Under section 74.402, a person may qualify as an expert witness on the issue of whether a health care provider departed from accepted standards of care only if the person

> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

*Id*. § 74.402(b) (Vernon 2005). In determining whether a witness is qualified on the basis of training or experience under section 74.402(b)(3), the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim and (2) is actively practicing health care in rendering health care related services relevant to the claim. *Id*. § 74.402(c).

Under rule of evidence 702, "[w]hat is required is that the offering party establish that the expert has 'knowledge, skill, experience, training, or

9

education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.403 (Vernon 2005).

## V.  DR. WAGNER'S QUALIFICATIONS

In their second issue, Appellants argue that the trial court abused its discretion by ruling that Dr. Wagner is not qualified to render an expert opinion as to whether Dr. Dean, Dr. Tauriainen, and CTSG departed from accepted standards of medical care regarding *the positioning and padding of Malcolm's arm* during the January 2004 multivessel coronary artery bypass graft procedure.

### A.    Dr. Dean's Objection

Dr. Dean did not object in the trial court that Dr. Wagner does not meet the criteria identified in section 74.401(a), (b), or (c).  Instead, Dr. Dean based his objection to Dr. Wagner's qualifications on only one ground, stating as follows:

> [Dr.] Wagner's *curriculum vitae* ("CV") fails to show that he has any training or experience as a cardiovascular surgeon.  Since Dr. Dean is a cardiovascular surgeon, Dr. Wagner is not and cannot be familiar with the standard of care applicable to a physician like or similar to Dr. Dean.

Dr. Dean's objection to Dr. Wagner's qualifications is without merit for more than one reason.

In delineating the statutory qualifications for a chapter 74 expert, the statute does not merely focus on the defendant physician's area of expertise but also on the condition involved in the claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a)(2) (requiring expert to have "knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition *involved in the claim*" (emphasis added)), § 74.401(c)(1), (2) (recognizing an expert may be qualified on the basis of training or experience if he or she is board certified or is practicing "in an area of medical practice *relevant to the claim*" (emphasis added)). That is, the applicable "standard of care" and an expert's ability to opine on it are dictated by the medical condition involved in the claim and by the expert's familiarity and experience with that condition. *See Granbury Minor Emergency Clinic v. Thiel*, No. 02-08-00467-CV, 2009 WL 2751026, at *4 (Tex. App.—Fort Worth Aug. 27, 2009, no pet.); *McKowen v. Ragston*, 263 S.W.3d 157, 162 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (permitting infectious disease physician to opine on standard of care for treating infection stemming from AV graft even though defendant doctor was cardiothoracic surgeon); *Blan v. Ali*, 7 S.W.3d 741, 746–47 & n.3 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

11

Here, according to Dr. Wagner's fourteen-page, single-spaced report, he specializes in anesthesiology and he has substantial personal knowledge and experience in the care and treatment of patients undergoing general anesthesia for cardiac surgical procedures. He is also familiar with how such procedures are managed. Included in the management of such procedures is the positioning and padding of the patient and the patient's extremities.[4] Appellants claim that Malcolm's postsurgical problems were caused by Appellees' negligence in failing to provide for *the proper positioning and padding of his arm*. Thus, Dr. Wagner has familiarity and experience with the specific medical condition involved in the claim, which is the focus of chapter 74.

Further, though not every physician automatically qualifies as an expert in every area of medicine, it is well established that a physician need not be a practitioner in the same specialty as the defendant to be qualified as an expert in a particular case. *Broders*, 924 S.W.2d at 152–53. If a particular subject is substantially developed in more than one medical field, a qualified physician in any of those fields may testify. *Id*. at 154; *see Rittger v. Danos*, No. 01-08-00588-CV, 2009 WL 1688099, at *7 (Tex. App.—Houston [1st Dist.] June

---

[4] Dr. Wagner additionally states, "Anesthesiology may also be defined as *continuity of patient care* involving preoperative evaluation, *intra-operative* and postoperative care and the management of systems and personnel that support these activities." [Emphasis added.]

12

18, 2009, no pet. h.) (stating that when a particular subject of inquiry is common to and equally developed in all fields of practice and the prospective medical expert witness has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those that confronted the practitioner charged with malpractice, the witness is qualified to testify).

Here, *the proper positioning and padding of Malcolm's arm* during the cardiac surgical procedure is not a subject exclusively within the knowledge or experience of a physician specializing in cardiovascular or thoracic surgery because Dr. Wagner, a physician who specializes in anesthesiology, is experienced in and familiar with how cardiac surgical procedures—including the positioning and padding of patients' extremities—are managed. Contrary to Dr. Dean's objection, Dr. Wagner's specialization in the field of anesthesiology instead of cardiovascular or thoracic surgery does not disqualify him from rendering an expert opinion as to whether Dr. Dean departed from accepted standards of medical care regarding *the proper positioning and padding of Malcolm's arm.*[5] *See Broders*, 924 S.W.2d at 153–54. We hold that the trial

---

[5] To the extent Dr. Dean argues that Dr. Wagner is not qualified to render an opinion for reasons other than the ground addressed above, we do not consider those waived objections because they were not raised in the trial court within twenty-one days after the date Dr. Dean was served with Dr.

13

court abused its discretion by ruling that Dr. Wagner is not qualified to render an expert opinion as to whether Dr. Dean departed from the accepted standards of medical care regarding *the positioning and padding of Malcolm's arm*. We sustain this part of Appellants' second issue.

### B.     Dr. Tauriainen's Objection

Dr. Tauriainen made the following objection in the trial court to Dr. Wagner's qualifications:

> [Dr. Tauriainen] objects to the qualifications of Dr. Wagner for the reason that they fail to meet the criteria, delineated in § 74.401(a), (b) and (c), that would permit him to offer expert testimony on the issue of whether Dr. Tauriainen departed from the accepted standards of medical care in this matter.

Dr. Wagner's report satisfies each of the section 74.401(a) requirements.

Dr. Wagner has been actively engaged in the practice of medicine from 1982 to the present, and he was practicing medicine as of the date of the

---

Wagner's report implicating Dr. Dean's conduct. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a); *Maris*, 262 S.W.3d at 384.

14

report and when the claim arose in January 2004.[6] Dr. Wagner thus satisfies the requirement of civil practice and remedies code section 74.401(a)(1).

As mentioned above, Dr. Wagner states that he has substantial personal knowledge and experience in the care and treatment of patients undergoing general anesthesia for cardiac surgical procedures. He is also familiar with the management of such procedures, which includes positioning and padding patients and patients' extremities in order to prevent perioperative peripheral neuropathies. Dr. Wagner consequently states that he has substantial knowledge of the reasonable, prudent, and accepted *standards of care* applicable to cardiovascular and cardiothoracic surgeons, general and traumatic surgeons, registered nurses, and physician assistants, among others, for "the diagnosis, assessment, care, and treatment of patients undergoing general anesthesia for cardiac surgical procedures," which includes the positioning and padding of the patient and the patient's extremities in order to prevent

---

[6] According to Dr. Wagner's curriculum vitae, which he fully incorporated by reference into his report, he has been the President and Managing Partner of Anesthesia Associates since 1986, he was the chairperson for the Department of Anesthesia at a Connecticut hospital, he was on the faculty of the Yale School of Medicine, he was an Assistant Professor of Anesthesia at the Yale School of Medicine, he was the CEO of Pain Therapy Consultants, and he was the director of an intensive care unit at a Connecticut hospital.

15

perioperative peripheral neuropathies. Dr. Wagner's knowledge of the applicable standards of care is based upon the following:

(1) his education, training, and experience;

(2) his familiarity with applicable medical literature;

(3) his familiarity with the applicable standards of medical and health care developed among anesthesiologists, cardiovascular and cardiothoracic surgeons, general and traumatic surgeons, nurses, and physician assistants in the positioning and padding of patients and the patients' extremities for the prevention of perioperative peripheral neuropathies under circumstances like Malcolm's;

(4) his familiarity with the minimum standards of reasonable, prudent, and accepted medical practices for the assessment, care, and treatment of surgical patients like or similar to Malcolm regarding the prevention of perioperative peripheral neuropathies; and

(5) his familiarity with the standards of reasonable, prudent, and accepted standards of medical care and treatment of surgical patients like Malcolm regarding the prevention of perioperative peripheral neuropathies that were applicable to all cardiovascular and thoracic surgeons, general or traumatic surgeons, nurses, and physician assistants as of 2004.

In light of his substantial knowledge of the reasonable, prudent, and accepted standards of care for Malcolm's condition, Dr. Wagner demonstrated that he "has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim," as mandated by civil practice and remedies code section 74.401(a)(2). *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a)(2).

16

As for the section 74.401(a)(3) requirement, Dr. Wagner states in his report that he became board certified in anesthesiology in 1985. He has been a Diplomate and Consultant to the American Board of Anesthesia since 1985 and a Diplomate to the National Board of Medical Examiners since 1982. Dr. Wagner's certification is relevant to Appellants' claim because Dr. Wagner is experienced in and familiar with how cardiac surgical procedures, including the proper positioning and padding of a patient's extremities, are managed. *See id*. § 74.401(c)(1).

Additionally, Dr. Wagner states that since 1982, he has administered and managed medical anesthesia care and treatment to over 10,000 patients undergoing surgeries in a supine position and to between 300 and 400 patients undergoing cardiac surgery. He also states that he has "extensive experience working cooperatively with nurses and physician[] assistants in the nursing and physician assistant care and treatment of patients undergoing general anesthesia for cardiac surgical procedures." Further, Dr. Wagner states that he has substantial knowledge of the causal relationship regarding an anesthesiologist's, cardiovascular and cardiothoracic surgeon's, and physician assistant's failures to meet the reasonable, prudent, and accepted standards of care and supervision in the diagnosis, care, and treatment of patients undergoing general anesthesia for cardiac surgical procedures. In light of

17

Dr. Wagner's substantial relevant experience, he has "other substantial training or experience in an area of medical practice relevant to" Appellants' claim. *See id*.

In considering section 74.401(c)(2), Dr. Wagner has specialized in the field of anesthesiology since 1983 and is actively engaged in the practice of medicine as the term is defined in section 74.401. We have already explained that Dr. Wagner's practice of anesthesiology is relevant to Appellants' claim. Thus, Dr. Wagner is actively practicing medicine in rendering medical care services relevant to Appellants' claim. *See id*. § 74.401(c)(2). Accordingly, considering that Dr. Wagner is board certified or has other substantial training or experience in an area of medical practice relevant to the claim and that he is actively practicing medicine in rendering medical care services relevant to the claim, he showed that he is "qualified on the basis of training and experience to offer an expert opinion regarding" the accepted and applicable standards of medical care in this case. *See id*. § 74.401(a)(3).

To the extent Dr. Tauriainen's objection based on section 74.401 implicates section 74.351(r)(5)(C), considering the totality of Dr. Wagner's report, he has knowledge, skill, experience, training, *or* education that qualifies him to give an opinion about whether Dr. Tauriainen's departure from accepted standards of medical care regarding the positioning and padding of Malcolm's

18

arm before, during, and after the surgical procedure had a causal relationship to Malcolm's injury because (1) he has substantial personal knowledge and experience in the care and treatment of patients undergoing general anesthesia for cardiac surgical procedures; (2) he has substantial knowledge of the reasonable, prudent, and accepted standards of care applicable to cardiovascular and cardiothoracic surgeons and other professionals for the care and treatment of patients undergoing general anesthesia for cardiac surgical procedures; (3) he has specialized in the field of anesthesiology since 1983 and has been board certified in anesthesiology since 1985; and (4) he has administered and managed medical anesthesia care and treatment to between 300 and 400 patients undergoing cardiac surgery. *See Broders*, 924 S.W.2d at 153. Dr. Wagner's report establishes that he is qualified to opine on the issue of causation because he is qualified to render such an opinion under the rules of evidence. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 74.351(r)(5)(C), 74.403(a).

Like Dr. Dean, Dr. Tauriainen argues that Dr. Wagner is not qualified to address the accepted standard of care in this case because he is an anesthesiologist, not a cardiovascular and thoracic surgeon. This argument is unpersuasive for the same reasons that it was unpersuasive for Dr. Dean. We hold that the trial court abused its discretion by ruling that Dr. Wagner is not

19

qualified to render an expert opinion as to whether Dr. Tauriainen departed from the accepted standards of medical care regarding *the positioning and padding of Malcolm's arm*. We sustain this part of Appellants' second issue.

### C. CTSG's Objection

CTSG challenged Dr. Wagner's qualifications to render an expert opinion as to whether it departed from the accepted standards of medical care relevant to Appellants' claims. Appellants alleged both direct and vicarious theories of liability against CTSG.[7] We construe CTSG's objection as a challenge to Dr. Wagner's qualifications to render an expert opinion as to CTSG's direct liability.[8]

As a professional association, CTSG is a "health care provider" as defined by section 74.001. *Id*. § 74.001(a)(12)(A). Thus, Dr. Wagner's report must demonstrate that he is qualified pursuant to section 74.402 to render an expert opinion as to CTSG's alleged departure from the applicable standard of care. *See id*. § 74.351(r)(5)(B). Unlike Dr. Wagner's report as to Dr. Dean and Dr.

---

[7] Regarding Appellants' direct liability claims, they alleged that CTSG negligently failed to supervise the quality of medical and health services for Malcolm.

[8] To the extent CTSG challenges Dr. Wagner's report as to Appellants' allegations that CTSG is vicariously liable for the actions and inactions of Dr. Tauriainen and Dr. Dean, we have already ruled above that the report was sufficient to demonstrate Dr. Wagner's qualifications to render an expert opinion as to Dr. Tauriainen and Dr. Dean.

20

Tauriainen, Dr. Wagner's report as to CTSG does not provide any information regarding his background, training, or experience from which it can be concluded that he has expertise about the standards of care generally applicable to professional associations. Dr. Wagner generally asserts that he is qualified to render an expert opinion on CTSG's conduct, but this alone is insufficient in the absence of any information within the report itself indicating any experience or training regarding the standards of care applicable to professional associations. We hold that the trial court did not abuse its discretion by sustaining CTSG's objection that Dr. Wagner's report failed to show that he is qualified under section 74.402 to opine regarding Appellants' direct liability claim against CTSG. We overrule this part of Appellants' second issue.

## VI. SUFFICIENCY OF DR. WAGNER'S REPORT

In their third issue, Appellants argue that the trial court abused its discretion by ruling that Dr. Wagner's report is insufficient to represent an objective good faith effort to comply with the definition of an expert report in section 74.351(r)(6). Dr. Tauriainen did not object in the trial court that Dr. Wagner's report was insufficient as to any of the section 74.351(r)(6) requirements. But Dr. Dean objected that Dr. Wagner's report was insufficient regarding the applicable standard of care and how Dr. Dean failed to meet that

21

standard of care, and CTSG challenged each requirement of section 74.351(r)(6).

**A.    Standard of Care**

Dr. Wagner states the following regarding the accepted and applicable standards of care in this case:

*The applicable reasonable, prudent and accepted standards of care for . . . Dr. [Tauriainen] [and] Dr. Dean . . . involved a shared responsibility on the part of each of these surgeons, the physician assistant, and nurses to properly position and pad [Malcolm's] left and right upper extremities before the start of the CABG surgical procedure, during the left radial artery harvest, after the left radial [artery] harvest and during the remainder of the surgery in order to prevent peripheral neuropathies to [Malcolm's] upper extremities.* Of the major nerves in the upper extremities, the ulnar nerve and brachial plexus nerves are and were the most common nerves to be at risk of injury and to become symptomatic and lead to major disability of a patient during and after the perioperative period. Improper surgical patient positioning and padding of upper extremities were well known causative factors in the development of surgical patients' ulnar neuropathies as of 2004 and such risks had been known by the surgical, physician assistants, hospital, and operating room nursing communities in the United States for many years.    As of 2004, reasonably prudent anesthesiologists, cardiovascular and cardiothoracic surgeons, general and traumatic surgeons, physician's professional associations, registered nurses, and physician[] assistants were or should have been aware that surgical patients in supine positions were at risk of developing ulnar nerve injuries and neuropathies during surgery due to external ulnar nerve compression or stretching caused by malpositioning and improper or inadequate padding during surgery. *Prevention of perioperative peripheral neuropathies to [Malcolm], including his left upper extremity, was preventable by proper positioning and padding of his left arm and hand.* Dr. Moss, with the cooperation of nurses Alexander and Syptak, should have positioned

22

[Malcolm's] right and left upper extremities in a manner to decrease pressure on the postcondylar groove of the humerus or ulnar groove. When his arms were tucked at the side the neutral forearm position with elbows padded would have been appropriate. When his left upper extremity was abducted on an arm board, that extremity should have been either in supination or a neutral forearm position. His arm should have been extended to less than ninety degrees. They should have applied padding materials such as foam sponges, eggcrate foam or gel pads, to protect exposed peripheral nerves in [Malcolm's] left arm, particularly at the site of his elbow and left ulnar groove. *Thus, after Drs. [Tauriainen] [and] Dean . . . harvested [Malcolm's] left radial artery from his left upper extremity extended on an armboard, they, together with Dr. Moss, and nurses Alexander and Syptak, should have assured that [Malcolm's] left upper extremity was returned to his side in a neutral forearm position and padding of his left elbow and any bony prominences should have been performed to protect his left ulnar nerve and prevent the risk of a left upper extremity neuropathy to the nerve. Also, Drs. [Tauriainen] and Dean . . . should have assured and followed procedures so that [Malcom's] left upper extremity was positioned in a neutral forearm position and properly padded to prevent the risk that any of the surgeons or assistants could come in contact or lean on his left arm during the surgical procedure.* [Emphasis added.]

The report thus includes Dr. Wagner's opinions on the element of standard of care. *See id*. § 74.351(r)(6). Dr. Dean and CTSG, however, cite *Taylor v. Christus Spohn Health System Corp.*, 169 S.W.3d 241 (Tex. App.—Corpus Christi 2004, no pet.), and argue that Dr. Wagner's report is insufficient because it fails to state with specificity the applicable standard of care for each defendant. *Taylor* has been thoroughly scrutinized by the appellate courts, and it does not expressly prohibit applying the same standard

23

of care to more than one health care provider if they all owe the same duty to the patient. *See Springer v. Johnson*, 280 S.W.3d 322, 332–33 (Tex. App.—Amarillo 2008, no pet.); *Livingston v. Montgomery*, 279 S.W.3d 868, 871–73 (Tex. App.—Dallas 2009, no pet.); *Sanjar v. Turner*, 252 S.W.3d 460, 466–67 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Dr. Wagner's report provides that Appellees all shared a responsibility to properly position Malcolm's arm. The report is not insufficient for "grouping" Appellees together because Dr. Wagner specifically states that they all owed the same duty to ensure the proper positioning and padding of Malcolm's arm. *See Springer*, 280 S.W.3d at 332; *Livingston*, 279 S.W.3d at 873; *Sanjar*, 252 S.W.3d at 466; *In re Stacy K. Boone*, 223 S.W.3d 398, 405–06 (Tex. App.—Amarillo 2006, no pet.) (holding that a single standard of care applicable to physicians and physician assistant was sufficient because all participated in administering treatment); *cf. Polone v. Shearer*, 287 S.W.3d 229, 235 (Tex. App.—Fort Worth 2009, no pet.) (holding report that set forth single standard of care applicable to physician and physician assistant insufficient to represent a good faith effort because "[a]lthough the standards of care might be the same for both [the physician and physician assistant], the report does not specifically state as much"). We hold that Dr. Wagner's report constitutes a good faith effort to identify and set forth the applicable standards of care in this case and that the

24

trial court abused its discretion by ruling otherwise. We sustain this part of Appellants' third issue.

**B.      Breach of Standard of Care and Causation**

Dr. Wagner's report states the following regarding how Appellees failed to meet the applicable standards of care and the causal relationship between that failure and the injury, harm, or damages claimed:

*It is my opinion that Dr. [Tauriainen] [and] Dr. Dean . . . failed to meet the applicable reasonable, prudent and accepted standards of medical care . . . for each of them in that they did not properly and adequately perform procedures to assure that [Malcolm's] left upper extremity was positioned and padded to decrease pressure on his left postcondylar groove of the humerus or ulnar groove in order to protect him from a serious and permanent left ulnar nerve injury and neuropathy to his left upper extremity.* During the surgery, [Malcolm] was asleep under the effects of general anesthesia and he was unable to care for himself and protect himself from a left upper extremity ulnar nerve injury and neuropathy. According to the hospital's intraoperative record[,] a left radial artery harvest was performed by Ms. Barnett-Wright, under the supervision of Dr. [Tauriainen] and Dr. Dean. After this harvest procedure, [Malcolm's] right arm was placed in a tucked and padded position on his right side, his left arm was placed on an olympic table for the left radial artery harvest procedure, and then his left arm was placed in a "tucked" position on his left side by Dr. Moss, with the cooperation of nurses Alexander and Syptak. *Dr. [Tauriainen] [and] Dr. Dean . . . had a shared responsibility with the anesthesiologist . . . to assure that [Malcolm's] left upper extremity was properly positioned and padded for the remainder of the CABG surgery. However, Dr. [Tauriainen] [and] Dr. Dean . . . improperly failed to position [Malcolm's] left arm and apply padding or adequate padding such as foam sponges, eggcrate foam, or gel pads to protect his exposed peripheral left ulnar nerve at the site of his elbow and left ulnar groove. Dr. [Tauriainen] [and]*

25

*Dr. Dean . . . should have directed Ms. Barnett-Wright to place [Malcolm's] left arm in a neutral forearm position and apply padding of his left elbow to protect his left ulnar nerve, and Dr. [Tauriainen] [and] Dr. Dean . . . should have checked the site of [Malcolm's] left arm and elbow to assure that these procedures had been properly followed, or Dr. [Tauriainen] [and] Dr. Dean should have performed these procedures themselves. It appears from the hospital record that Dr. [Tauriainen] [and] Dr. Dean . . . did not adequately direct Ms. Barnett-Wright in the positioning and placement of [Malcolm's] left arm to protect his left ulnar nerve following the left radial artery harvest, and that they did not adequately perform these procedures themselves nor assure that Ms. Barnett-Wright had done so to protect [Malcolm's] left ulnar nerve. . . . These standard of care failures by Dr. [Tauriainen] [and] Dr. Dean . . . very likely resulted in the exposure of [Malcolm's] left ulnar peripheral nerve to excessive external pressure or stretching, or both, over a prolonged period of approximately four hours during the surgical procedure and this prolonged pressure and/or stretching most likely resulted in a serious and permanent left ulnar nerve injury and neuropathy to [Malcolm's] left arm and hand, and [Malcolm's] physical impairments in the use of his left hand consisting of pain, numbness, stiffness, impaired use of his left hand and two fingers involved.* My opinion in this regard is based upon the facts that [Malcolm] did not have any preoperative history of left upper extremity neuropathy, the hospital intraoperative records indicate that his left upper extremity was inappropriately and inadequately positioned and padded during the surgery, [and] he awoke from general anesthesia in the ICU and immediately perceived painful throbbing, burning and swelling of his left arm and hand. . . . *If Dr. [Tauriainen] [and] Dr. Dean . . . with the cooperation of Ms. Barnett-Wright, had properly positioned and padded [Malcolm's] left arm, and particularly the area of his elbow and ulnar groove, his ulnar nerve would not have been exposed to prolonged pressure throughout the remainder of the surgery, and in all reasonable medical probability, he would not have suffered permanent left upper extremity ulnar nerve injury and neuropathy for the reasons which I have discussed above.* [Emphasis added.]

26

The report thus includes Dr. Wagner's opinions on the elements of the manner in which the care rendered by Appellees failed to meet the applicable standards of care and the causal relationship between that failure and the injury, harm, or damages claimed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). The report also links Appellees' purported breach of the applicable standards of care to Malcolm's alleged injuries. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52 (requiring expert to explain the basis of his statements regarding causation and link his conclusions to the facts). We hold that Dr. Wagner's report represents an objective good faith effort to identify and set forth how Appellees breached the applicable standards of care and the causal relationship between that failure and the injuries claimed. Dr. Wagner's report indisputably informs Appellees of the specific conduct Appellants have called into question and provides a basis for the trial court to conclude that the Appellants' claims have merit. *See Palacios*, 46 S.W.3d at 879. We hold that the trial court's ruling otherwise was arbitrary or unreasonable, or without reference to any guiding rules or principles, and, thus, an abuse of discretion. We sustain the remainder of Appellants' third issue.

## VII. CONCLUSION

Having overruled part of Appellants' second issue, we affirm the part of the trial court's order sustaining CTSG's objection that Dr. Wagner's report

27

failed to show that he is qualified under section 74.402 to render an expert opinion as to CTSG's direct liability and dismissing Appellants' direct liability claims against CTSG. Having sustained the remainder of Appellants' second issue and all of their third issue, we reverse the trial court's order sustaining each of Appellees' other objections to Dr. Wagner's report and dismissing Appellants' claims against Dr. Dean and Dr. Tauriainen and their vicarious liability claims against CTSG. We remand the case to the trial court for further proceedings.


BILL MEIER
JUSTICE

PANEL:  CAYCE, C.J.; LIVINGSTON and MEIER, JJ.

DELIVERED:  October 29, 2009

28