

NUMBER 13-10-00309-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

CHRISTUS SPOHN HEALTH SYSTEM
CORPORATION D/B/A CHRISTUS SPOHN
HOSPITAL CORPUS CHRISTI - SOUTH,      **Appellant,**

v.

JESSE J. CERVANTES, INDIVIDUALLY AND
ON BEHALF OF THE ESTATE OF ELENA F.
CERVANTES, DECEASED, AND JOANN
ESCOBAR, AND NELDA VELA, INDIVIDUALLY,    **Appellees.**

On appeal from the 319th District Court
of Nueces County, Texas.

# MEMORANDUM OPINION

Before Justices Garza, Benavides, and Vela
Memorandum Opinion by Justice Garza

In this interlocutory appeal, appellant Christus Spohn Health System Corporation

d/b/a Christus Spohn Hospital Corpus Christi-South ("Christus") challenges the trial

court's order denying its motion to dismiss a health care liability claim brought by appellees Jesse J. Cervantes, individually and on behalf of the estate of Elena F. Cervantes, Joann Escobar, and Nelda Vela. By a single issue, Christus contends that the trial court erred in concluding that appellees' expert reports complied with section 74.351 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (Vernon Supp. 2010). We affirm.

## I. BACKGROUND

Elena Cervantes, a 51-year-old woman, was admitted to Christus on November 24, 2006, complaining of shortness of breath, chest pain, cough, and fever. Nicole Ewing, M.D., an emergency room physician, examined Elena and noted that she was "toxic appearing," had a rapid heart rate and difficulty breathing. Dr. Ewing also noted that Elena had highly elevated blood sugar and low oxygen saturation in her blood. After further examination, Dr. Ewing diagnosed Elena with community-acquired pneumonia. Elena was then admitted to Christus's intensive care unit ("ICU"), where she was treated by Sunil K. Gupta, M.D. On Dr. Gupta's orders, Elena began taking Levaquin, an antibiotic. Several hours later, a nurse reported that Elena was aphasic, or unable to speak. After undergoing a CT scan, Elena went into respiratory arrest at around 2:00 a.m. the following morning. At around 9:00 a.m., another physician, Pradyumma C. Mummady, M.D., examined Elena. Elena died at 9:56 a.m. Blood cultures taken after Elena's death revealed the presence of Staphylococcus bacteria.

Appellees[1] filed suit against Christus and Drs. Ewing, Gupta, and Mummady on

---

[1] Appellee Jesse Cervantes is Elena's surviving husband. The record does not reflect what relation, if any, appellees Escobar and Vela had to Elena.

2

November 17, 2008.[2]  The lawsuit alleged in part that Christus, by and through its nursing staff, (1) improperly assessed Elena's medical condition, (2) failed to notify the physicians of changes in Elena's medical condition, (3) improperly responded to Elena's changes in condition, and (4) improperly administered medical and nursing care and treatment to Elena.  In support of their original petition, appellees attached expert medical reports authored by John J. Stern, M.D., a clinical professor of medicine at the University of Pennsylvania, and Beatriz C. Smith, a registered nurse.  *See id.* § 74.351(a).

Christus timely responded to the lawsuit and filed objections to the sufficiency of the expert reports.  After a hearing on January 20, 2010, the trial court agreed with Christus that the reports were insufficient.  The trial court specifically found that, with respect to Christus, "the reports together are sufficient to detail the conduct the plaintiff calls into question.  However, the Court finds that the reports, taken together, do not adequately address the standard of care required of the nurses and do not adequately address the issue of causation."  The trial court granted appellees one thirty-day extension to cure the deficiency.  *See id.* § 74.351(c).

On March 19, 2010, appellees filed supplemental reports by Smith and Dr. Stern.  In her supplemental report, Smith stated that the standard of care applicable to the nursing staff was to:

1. Perform comprehensive nursing assessments regarding the health status of the patient, and in the case of Elena Cervantes, note in particular her medical history of staphylococcus infection and clearly observable symptoms of sepsis.

2. Make nursing diagnoses that serve as the basis for the strategy of

---

[2] The individual physician defendants are not parties to this appeal.

3

care, and in the case of Elena Cervantes, note in particular her medical history of staphylococcus infection, consequent susceptibility to same, and symptoms of acute sepsis.

3. Develop a plan of care based on the assessment and nursing diagnosis.

4. Implement appropriate nursing care.

5. Evaluate the patient's responses to nursing interventions, and in the case of Elena Cervantes, notify treating physicians and emergency room and ICU physicians of the non-efficacy of measures to control blood glucose and infection.

Smith then identified the following breaches of the standard of care:

1. In emergency room triage, the nursing staff failed to perform a proper assessment that would have alerted hospital staff to Elena Cervantes'[s] clearly observable symptoms of sepsis and allow notification of treating physicians and emergency room and ICU physicians.

2. The emergency room nursing staff failed to notify Elena Cervantes'[s] physicians of the dire nature of her condition—namely uncontrolled blood sugar and symptoms of acute sepsis.

3. In the emergency room, L. Guarneri, R.N., failed to perform a comprehensive assessment of the health status of Elena Cervantes and failed timely to assess and implement interventions on Elena Cervantes'[s] behalf, including control of blood glucose by insulin administration and treatment of infection via antibiotic administration. . . .

4. Nurse Guarneri also failed to evaluate Elena Cervantes'[s] response to the administered therapies and communicate the non-efficacy of efforts to control infection. . . . .[3]

In his supplemental report, Dr. Stern stated that the ICU nursing staff breached the applicable standard of care by "fail[ing] to accurately note the clinical symptoms and presentation of Elena Cervantes so that those symptoms could be conveyed to her treating physicians" and by "fail[ing] to convey to Elena Cervantes'[s] physicians the dire

---

[3] Smith did not address the issue of causation in her report.

4

nature of her condition and to insist that she have prompt physician evaluation." Dr. Stern then offered the following opinion as to how these breaches caused the damages suffered by Elena:

1.      Accurately noting the patient's symptoms and presentation. Had the nursing staff properly observed and reported Elena Cervantes'[s] symptoms, presentation, and medical history, in reasonable medical probability her acute sepsis would have been diagnosed and treated earlier and within the window of opportunity when such treatment would have been much more likely to be effective. The failure of the nursing staff to impress upon Elena Cervantes'[s] physicians the dire nature of her condition contributed to the failure to treat her properly and, ultimately, her death.

2.      Communication of the patient's condition to her physicians. Had the nursing staff demanded earlier physician involvement, Ms. Cervantes'[s] care probably would have, at a minimum, included additional appropriate antibiotic therapy. A reasonable ICU physician, upon being presented with a realistic account of Ms. Cervantes'[s] condition[,] would have prescribed a broad-based course of antibiotic therapy. Given that her death was unquestionably secondary to the relentless effect of a Staphylococcal aureus sepsis, earlier physician involvement would certainly have had a saluterious [sic] effect on her health and in reasonable probability saved her life.

Christus again objected to the reports' sufficiency and moved to dismiss, asserting that Smith's report "improperly opines on causation" and that Dr. Stern's report "is conclusory on the issue of causation, and does not directly link actions or omissions by the nurses to injuries suffered by the plaintiffs." After a hearing, the trial court found the reports to be adequate and denied Christus's motion to dismiss. This accelerated interlocutory appeal followed. *See id.* § 51.014(a)(9) (Vernon 2008) (permitting appeal of interlocutory order denying all or part of a motion to dismiss for failure to serve an expert report in a health care liability claim); TEX. R. APP. P. 28.1(a) (stating that appeals

5

from interlocutory orders are accelerated).

## II. STANDARD OF REVIEW AND APPLICABLE LAW

We review a trial court's order denying a motion to dismiss for failure to comply with the expert report requirement under an abuse of discretion standard. *NCED Mental Health, Inc. v. Kidd*, 214 S.W.3d 28, 32 (Tex. App.–El Paso 2006, no pet.) (applying abuse of discretion standard to trial court's denial of motion to dismiss); *Kendrick v. Garcia*, 171 S.W.3d 698, 702 (Tex. App.–Eastland 2005, pet. denied) (same); *see Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001) (applying abuse of discretion standard to trial court's granting of motion to dismiss). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). However, a trial court has no discretion in determining what the law is or in applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992); *Baylor Univ. Med. Ctr. v. Biggs*, 237 S.W.3d 909, 916 (Tex. App.–Dallas 2007, pet. denied). Therefore, when the issues are purely questions of law, we effectively conduct a de novo review. *See Pallares v. Magic Valley Elec. Coop., Inc.*, 267 S.W.3d 67, 69-70 (Tex. App.–Corpus Christi 2008, pet. ref'd).

Under chapter 74, a plaintiff asserting a health care liability claim must serve a medical expert report upon each party's attorney no later than the 120th day after the date the original petition was filed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a).[4] The

---

[4] The statute defines "health care liability claim" as:

a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care,

6

report must "provide[] a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). If it appears to the court, after a hearing, that the report does not represent an "objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)," then the trial court must dismiss the claim. *Id.* § 74.351(*l*). To constitute a "good faith effort," the report must provide enough information to (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *see Palacios*, 46 S.W.3d at 879.

The trial court should look no further than the report itself, because all the information relevant to the inquiry is contained within the document's four corners. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52 (citing *Palacios*, 46 S.W.3d at 878). The report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the three elements that the civil practice and remedies code identifies: standard of care, breach, and causation. *Id.* Moreover, an expert cannot merely state conclusions about these elements; the expert must explain the basis of his or her statements to link the conclusions with the facts. *Id.* (citing *Palacios*, 46 S.W.3d at 878; *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)).

which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13) (Vernon 2005). It is undisputed that appellees' claims fall under this definition.

7

### III. ANALYSIS

Christus argues on appeal that Dr. Stern's opinion is inadequate under chapter 74 because it is conclusory and speculative as to causation.[5]  *See id.*

First, Christus asserts that the report is conclusory as to causation because it "fails to explain exactly what [Christus] nurses should have done, yet failed to do."[6]  Christus specifically takes issue with Dr. Stern's statements that:   (1) Elena's acute sepsis would have been diagnosed earlier "[h]ad the nursing staff properly observed and reported [Elena's] symptoms, presentation, and medical history"; and (2) the failure of the nurses to "impress upon" the physicians the "dire nature" of Elena's condition contributed to her death.   Christus argues that "[w]ords like 'proper' and 'impress upon' and 'dire' are subjective and do not inform [Christus] of exactly how the nurses' actions or omissions allegedly caused [Elena's] injury and/or death."   *See Palacios*, 46 S.W.3d at 880 ("Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently . . . a fair summary must set out what care was expected, but not given.").   However, Dr. Stern's

---

[5] We note that Christus's arguments on appeal pertain entirely to Dr. Stern's report.   Christus does not argue on appeal that Smith's report was inadequate in any way, despite having previously asserted in its objections and motion to dismiss in the trial court that Smith's report "improperly opine[d] on causation." The judgment on appeal—which merely stated that the trial court found "the reports to be adequate"—arguably implied that each report is *independently* adequate to satisfy the chapter 74 requirement.   If that were the case, then we would be bound to affirm the trial court's judgment regardless of the adequacy of Dr. Stern's report.   Nevertheless, the parties do not address this possibility.   Moreover, the parties appear to agree on appeal that Smith's report did not address the issue of causation at all. Accordingly, we will affirm only if Dr. Stern's report was adequate as to the issue of causation.

[6] As appellees note, this argument appears to challenge the adequacy of Dr. Stern's report with respect to the standard of care element, rather than the causation element.   However, Christus's objections to Dr. Stern's report in the trial court complained only that the report "is conclusory on the issue of causation, and does not directly link actions or omissions by the nurses to injuries suffered by the plaintiffs." Therefore, Christus has not preserved any issue regarding the adequacy of Dr. Stern's report with respect to the standard of care element.   *See Barber v. Dean*, 303 S.W.3d 819, 826 n.5 (Tex. App.–Fort Worth 2009, no pet.) (noting that grounds for insufficiency of an chapter 74 expert report not specifically raised by timely objection are waived).   We will address Christus's issue only insofar as it bears upon the adequacy of the report as to the causation element.

8

statements regarding causation obviously referenced the explanation earlier in his report that the nursing staff breached its standard of care by failing to note Elena's "fever, poor oxygen and $CO_2$ processing" and "her history of staphylococcal infection" and by failing to communicate those facts to Elena's treating physicians. This statement explained what the nurses should have done; the subsequent statement regarding causation then explained why the nurses' failure to do those things led to the damages claimed by Elena.

Christus further contends that Dr. Stern's report is speculative because "it provides no basis for his assumption that the nurses (as opposed to the independent actions of [the] physician defendant[s]) affirmatively caused Ms. Cervantes harm." In support of this contention, Christus cites *Costello v. Christus Santa Rosa Health Care Corp.*, in which the plaintiff's expert opined merely that "[i]f this patient would have been appropriately triaged and evaluated, then in all medical probability she would have survived." 141 S.W.3d 245, 249 (Tex. App.–San Antonio 2004, no pet.). The San Antonio Court of Appeals found this to be inadequate for purposes of chapter 74, noting that "[w]hile no particular term or phrase is required for an expert to establish causation, the converse is also true," and "[w]ithout more, the magic words of 'reasonable medical probability' provide no evidence of causation." *Id.* Here, however, Dr. Stern has provided more than just "magic words"; he has explained exactly what the nurses should have done and why their failure to do it probably caused Elena to suffer harm. Specifically, Dr. Stern noted that, had the nurses "demanded earlier physician involvement," those physicians would have at least prescribed additional antibiotic therapy, which probably would have saved Elena's life. Although Dr. Stern's causation

9

theory with respect to the nurses is dependent on subsequent actions taken by a physician, Dr. Stern also opines that "[a] reasonable ICU physician, upon being presented with a realistic account of Ms. Cervantes'[s] condition[,] would have prescribed a broad-based course of antibiotic therapy." He has provided the necessary causal link—from the nurses' omissions to the physicians' actions to the damages suffered by Elena—thereby providing "a basis for the trial court to conclude that the claims have merit." *Bowie Mem'l Hosp.*, 79 S.W.3d at 52.

Finally, Christus argues that "Dr. Stern's choice of terminology"—specifically, his use of the word "probably"—"belies the speculative nature of his causation opinion." Christus states as follows in its appellate brief:

> As explained by the Texas Supreme Court, words like "probably," "'perhaps,' and 'possibly' indicate conjecture, speculation, or mere possibility rather than a qualified opinion based on reasonable medical probability." *Columbia Med. Ctr. of Los Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 246-47 (Tex. 2008) . . . .

This is a mischaracterization of the supreme court's holding in *Hogue.* In that case, the Court found, in a legal sufficiency challenge to the evidence supporting the verdict in favor of the plaintiff, the following expert testimony to be insufficient to raise a question of fact on causation:

> Q: And if you would have considered [a] cardiac cause higher on [your differential diagnosis], would that have meant you would have considered obtaining a consultation of a cardiologist?
>
> A: *Possibly.*
>
> Q: Would that have meant that you would have considered requesting an echocardiogram?
>
> A: *Possibly.*

10

*Id.* at 247. The Court then explained that "'[p]erhaps' and 'possibly' indicate conjecture, speculation or mere possibility rather than qualified opinions based on reasonable medical probability." *Id.* Christus's attempt to add "probably" to the list of words indicating conjecture is obviously wrong. In fact, "probability" with respect to causation is precisely the standard for recovery in an action under chapter 74. *See, e.g., Columbia Rio Grande Healthcare v. Hawley*, 284 S.W.3d 851, 860 (Tex. 2009) ("Recovery in a medical malpractice case requires *proof to a reasonable medical probability* that the injuries complained of were proximately caused by the negligence of a defendant." (Emphasis added.)). Dr. Stern's well-supported opinion that certain additional action by the nurses would have "in reasonable probability saved [Elena's] life" was sufficient to "provide a basis for the trial court to conclude that the claims have merit." *Bowie Mem'l Hosp.*, 79 S.W.3d at 52. Accordingly, the report complied with the chapter 74 requirement.

We conclude that the trial court did not err by denying Christus's motion to dismiss. Christus's sole issue is overruled.

## IV. CONCLUSION

We affirm the judgment of the trial court.

DORI CONTRERAS GARZA
Justice

Delivered and filed the
10th day of February, 2011.

11