

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00313-CV

GERALD ROBERT STEPHENSON, M.D.                                          APPELLANT

V.

NATASHA MILLER, INDIVIDUALLY AND AS THE SURVIVING SPOUSE, HEIR AT LAW, COMMUNITY SURVIVOR, AND PERSONAL REPRESENTATIVE OF STEVE MILLER, DECEASED, AND AS MOTHER, NEXT FRIEND AND JOINT MANAGING CONSERVATOR OF JAYLYNN DENIQUE MILLER, DEYLIN RAESHAWN MILLER, AND JACOBE ANTONIO MILLER, MINORS, AND AS COMMUNITY SURVIVOR AND BENEFICIARY OF THE ESTATE OF STEVE MILLER, DECEASED, AND AS BENEFICIARY, PURSUANT TO THE TEXAS WRONGFUL DEATH STATUTE AND TEXAS SURVIVAL STATUTE; AND CYNTHIA MILLER, INDIVIDUALLY AND AS THE SURVIVOR, HEIR AT LAW, AND BENEFICIARY PURSUANT TO THE TEXAS WRONGFUL DEATH STATUTE AND TEXAS SURVIVAL STATUTE, AND AS JOINT MANAGING CONSERVATOR OF JAYLYNN DENIQUE MILLER, DEYLIN                                          APPELLEES

RAESHAWN MILLER, AND JACOBE
ANTONIO MILLER, MINORS

----------

FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY

----------

# MEMORANDUM OPINION[1]

----------

Gerald Robert Stephenson, M.D. appeals from the trial court's interlocutory order refusing to dismiss the health care liability claims of appellees Natasha Miller, in her individual and other capacities, and Cynthia Miller, individually and in her other capacities. In two issues, appellant challenges the expert reports proffered by appellees as to standard of care and causation. We affirm.

## Procedural Background

Appellees sued appellant, a surgeon who transplanted a kidney into Steve Miller, alleging that Miller died after appellant failed to recognize signs of postoperative bleeding, failed to timely order labs that would have purportedly diagnosed the bleeding at an earlier time, and failed to institute timely and appropriate therapies that would have prevented Miller's death from cardiac arrest. Appellant filed a motion to dismiss for failure to file an adequate expert report, which the trial court denied.

## Standard of Review

[1]See Tex. R. App. P. 47.4.

A trial court's decision on a motion to dismiss under section 74.351 is subject to an abuse of discretion standard. *See, e.g., Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.* at 242. A trial court does not abuse its discretion if it commits a mere error in judgment. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

**Expert Report Requirements**

In a health care liability claim, a claimant must serve on each defendant an expert report that addresses standard of care, liability, and causation no later than the 120th day after the claim is filed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (j) (West 2011); *Barber v. Mercer*, 303 S.W.3d 786, 790 (Tex. App.—Fort Worth 2009, no pet.). If an expert report has not been served on a defendant within the 120-day period, then on the motion of the affected defendant, the trial court must dismiss the claim with prejudice and award the defendant reasonable attorney's fees and costs. Tex. Civ. Prac. & Rem. Code

Ann. § 74.351(b); *Barber*, 303 S.W.3d at 790. A report "has not been served" under the statute when it has been physically served but it is found deficient by the trial court. *Lewis v. Funderburk*, 253 S.W.3d 204, 207–08 (Tex. 2008); *Barber*, 303 S.W.3d at 790–91. When no report has been served because the report that was served was found to be deficient, the trial court has discretion to grant one thirty-day extension to allow the claimant the opportunity to cure the deficiency. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c); *Barber*, 303 S.W.3d at 791.

A report is deficient (therefore subjecting a claim to dismissal) when it "does not represent an objective good faith effort to comply with the definition of an expert report" in the statute. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*); *Barber*, 303 S.W.3d at 791. While the expert report "need not marshal all the plaintiff's proof," *Palacios*, 46 S.W.3d at 878, it must provide a fair summary of the expert's opinions as to the "applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Barber*, 303 S.W.3d at 791.

To qualify as a good faith effort, the report must "discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 875;

4

*Barber*, 303 S.W.3d at 791. A report does not fulfill this requirement if it merely states the expert's conclusions or if it omits any of the statutory requirements. *Palacios*, 46 S.W.3d at 879; *Barber*, 303 S.W.3d at 791. The information in the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios*, 46 S.W.3d at 879; *Barber*, 303 S.W.3d at 791. When reviewing the adequacy of a report, the only information relevant to the inquiry is the information contained within the four corners of the document alone. *Palacios*, 46 S.W.3d at 878; *Barber*, 303 S.W.3d at 791; *see Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *Barber*, 303 S.W.3d at 791; *see Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.) (citing *Bowie Mem'l Hosp.*, 79 S.W.3d at 53).

"[I]t is not enough that the expert report 'provided insight' about the plaintiff's claims. Rather, to constitute a good-faith effort to establish the causal-relationship element, the expert report must fulfill *Palacios*'s two-part test." *Bowie Mem'l Hosp.*, 79 S.W.3d at 52 (citation omitted); *Farishta v. Tenet Healthsystem Hosps. Dallas, Inc.*, 224 S.W.3d 448, 453 (Tex. App.—Fort Worth 2007, no pet.). The expert "must explain the bases of the statements [made regarding causation] and link his or her conclusions to the facts." *Farishta*, 224 S.W.3d at 453–54 (quoting *Longino v. Crosswhite*, 183 S.W.3d 913, 917–18 (Tex. App.—Texarkana 2006, no pet.)). The report must provide enough

5

information within the document to both inform the defendant of the specific conduct at issue and to allow the trial court to conclude that the suit has merit. *Bowie Mem'l Hosp*., 79 S.W.3d. at 52.

## Analysis

In two issues, appellant challenges the adequacy of the expert reports provided by appellees because (1) the standard of care and breach opinions lump all the doctors together collectively and (2) the causation opinions lump all the doctors together and fail to specify how the breaches caused Miller's death or specifically link those breaches to the cause of death.

### Standard of Care

Dr. Ronald Ferguson, appellee's first expert, had over thirty years' experience in the "practice of transplant surgery and the care of kidney transplant patients." He opined that appellant was aware of Miller's postoperative hematocrit drop to 21.7[2] and elevated potassium of 8.8; a note from appellant the morning after surgery notes the potassium of 8.8 "and the delayed graft function (DGF) of the transplanted kidney." It also notes that Miller "would be scheduled to be hemodialyzed 'today.'" At 8:03 a.m. the morning after surgery, appellant made a requisition for 1 gram of calcium gluconate by IV for Miller.

---

[2] In some parts of the report, Dr. Ferguson refers to the hematocrit drop as being to 21.7, and in others, he refers to it as being 22.7. For purposes of this opinion, the difference is not significant.

6

Dr. Ferguson noted that appellant was an independent contractor of Harris Methodist Hospital and that he was bound by their Renal Transplant Program 2006 Protocol guidelines.  According to Dr. Ferguson,

> The transplant surgeon is to be available post-operatively for the usual post-operative care, [and] for consultation with the Medical Director, including the occurrence of possible surgical problems. *Concurrently*, the nephrologists are responsible for the management of the transplant patients post-operatively.  In the case of Steve Miller, nephrologists Linh Le, M.D., Rubina Khan, M.D., Shane Kennedy, M.D., and Charles Andrews, M.D., all part of Dialysis Associates, were to be responsible for the care of Steve Miller.

> In addition to the above operational guidelines set by the Protocol for the Kidney Transplant Program and Unit, the Protocol set had established guidelines for the Post Operative Management of the Transplant Recipient.  The protocol is *their* standard of care for the post-operative care and management of a kidney transplant recipient.

> According to the Harris Methodist Hospital – Fort Worth Renal Transplant Program 2006 Protocol, applicable to the care of Steve Miller on April 2nd and 3rd, 2007, . . . Gerald R. Stephenson, M.D. . . . failed to implement this Protocol in the care of Steve Miller by failing to assess, monitor, and/or communicate Steve Miller's fractional urine output that was significantly lower than the 500 cc per four hours set as the standard quantitative guideline of the Protocol.

> Steve Miller, whose urine output post-operatively, was less than 20cc per hour since surgery, necessitated laboratory monitoring every four hours.  Accordingly, the Protocol dictated that a complete blood count (CBC) and basic metabolic panel (BMP) were to be analyzed every four hours until routine labs the following morning. This Protocol, had it been implemented as dictated, would have provided a CBC, including a hemoglobin and hematocrit, and a BMP, which included a potassium level, at 9:30 p.m., 1:30 a.m., and 5:30 a.m.  This pattern of monitoring was critical in the care denied Steve Miller.

> . . . .

7

. . . Gerald Robert Stephenson, M.D., failed to implement Harris Methodist Hospital – Fort Worth – Renal Transplant Program 2006 Protocol and obtain on Steve Miller a complete blood count and basic metabolic panel every four hours post-operatively until morning, necessitated by his oliguric status. The protocol recognizes the minimal standard set forth in the community for kidney transplant patients. The standard approach recognized for laboratory monitoring in the first 24 hours post renal transplant would be to obtain testing for hemoglobin, hematocrit, and electrolytes (at least) every six hours for the first twenty four hours post transplant. . . .

Had their own Protocol been implemented, or the community standard cited above, Steve Miller's post-operative bleeding and hyperkalemia[3] would have been detected at a much earlier time allowing much earlier treatment.

. . . .

- Dr. Stephenson is documented in the nursing records to be at Steve Miller's bedside at 7:30 a.m. on April 3, 2007.

. . . .

- Christina Collier, R.N. reports that "Dr. Stephenson was actually in the unit making rounds, so I provided him with a copy of the morning labs. This was approximately 7:30 a.m. on April 3, 2007. . . ."]

- Christina Collier, R.N., reports that Dr. Stephenson was at Steve Miller's bedside at 7:30 a.m., and documents it in the nurse's notes. Further documentation by Nurse Collier notes that "Dr. Kahn and Dr. Stephenson aware" of Steve Miller's laboratory values, including his potassium of 8.8 and his hematocrit of 22.7.

. . . .

---

[3]Hyperkalemia is "[a] greater than normal concentration of potassium ions in the circulating blood." Stedman's Med. Dictionary 921 (28th ed. 2006).

In addition to having the critical, life threatening potassium level, indicating his severe hyperkalemia, Steve Miller was also hypovolemic,[4] having critically low hematocrit and hemoglobin values that were made known to Drs. Stephenson and Khan at 7:25 a.m., on 4/3/07. At this time, Steve Miller's condition was extremely critical and life threatening. Mr. Miller's kidney had produced very little urine (oliguria) and the hematocrit and hemoglobin values indicated an internal hemorrhage. As indicated before, the accepted standard for medical care for such a patient in critical condition would require urgent therapy with intravenous Calcium Gluconate or an insulin and glucose combination. . . .

. . . .

Furthermore, [although Dr. Khan ordered 1 gram of calcium gluconate "now"] neither Dr. Khan nor Dr. Stephenson took responsibility to assure that the Calcium Gluconate was immediately processed and administered. In fact, Dr. Stephenson testifies that he left the entire clinical emergency management of Steve Miller up to Dr. Khan, absent the ordering [of] an advancement of Steve Miller's diet to 'clear liquids'.

*Drs. Khan and Stephenson*, Nurses Laureano, Collier, and Dickerson, Harris Methodist Fort Worth Hospital and its health care providers, *each had a duty,* as respective medical doctors, registered nurses and health care providers of Harris Methodist Hospital – Fort Worth, to Steve Miller, in an emergency situation, to see that the 'Now' order was immediately communicated to the pharmacy, [and] processed and administered to Steve Miller within one hour. Steve Miller was administered the Calcium Gluconate over two hours later. This is below the standard of care for medical doctors, specifically Rubina Khan, M.D. and Gerald Stephenson, M.D. . . .

*. . . .*

1. The standard of care for a post-operative kidney transplant patient is to have a blood assessment, at the very minimum, every six hours, post-operatively, which

---

[4]Hypovolemic means having "a decreased amount of blood in the body." *Id*. at 939.

would include a basic metabolic panel. *The standard of care would require that both the surgeon, in this case, Dr. Gerald Stephenson, M.D., and the nephrologist group (Dialysis Associates), and the individual nephrologist, in this case, Linh Le, M.D., Shane Kennedy, M.D. and Rubina Khan, M.D., would be responsible for seeing that such order was entered*. . . .

. . . .

3.    The medical records do not indicate that either Drs. Stephenson or Khan properly diagnosed the fact that Steve Miller was hypovolemic as a result of an internal hemorrhage, which was causing his low hematocrit and hemoglobin levels (as well as the critical potassium value of 8.8). The calcium gluconate, together with the insulin glucose combination should have been given intravenously and immediately. The accepted standard of care would require the proper diagnosis be made of Steve Miller's critical condition that he was bleeding internally, and thus, hyperkalemic, and *the standard of care would require that* he be administered the above therapy intravenously and that *both Drs. Khan and Stephenson should have made certain that this order was carried out and that therapy was given immediately. It was a violation of the standard of care for them not to do so*. . . .

4.    It was a violation of the standard of care to not order the intravenous timely administration of Calcium Gluconate or the insulin glucose combination as well as dialysis, without ultrafiltration. . . .

. . . *Both Drs. Stephenson and Khan failed to treat the primary cause of Steve Miller's hyperkalemia, the post-operative bleeding*. The accepted standard of care for a post-operative kidney patient, such as Steve Miller, would have been not to decrease his fluid volume, created quite possibly by surgical post-operative bleeding, and to treat medically his hyperkalemia. Rubina Khan, M.D. and Gerald Robert Stephenson, M.D. failed to perform any of these that were required by the accepted standards of care, for a patient of Mr.

10

> Miller's condition. Furthermore, *it is a violation of the standard of care by both Rubina Khan, M.D. and Gerald Robert Stephenson, M.D., both of whom had the responsibility for Steve Miller upon examining him at 7:25 a.m., on 4/03/07, to order and/or permit him to receive ultrafiltration . . . . The standard of care for the nephrologist on duty in the early morning hours of 4/03/07, . . . as well as . . . Dr. Stephenson, the kidney transplant surgeon*, was to diagnose Steve Miller as suffering from post-operative bleeding which required immediate treatment . . . . Rubina Khan, M.D. and Gerald Robert Stephenson, M.D. failed to take any of the appropriate actions necessary to treat the extremely critical conditions caused by Steve Miller's post-operative bleeding. [Emphasis added.]

Dr. Gallon, appellees' second expert, had over ten years' experience in the practice of transplant surgery and the care of transplant patients. He states in his report that the nephrologists were responsible for postoperative management of transplant patients and that "[t]he transplant surgeon, Gerald Robert Stephenson, M.D., was concurrently responsible for Steve Miller's post-operative monitoring, care and intervention as it related to the surgical procedure and potential complications and/or issues related to the kidney allograft."

"Concurrent" is defined as "[o]perating at the same time[,]… covering the same matters." Black's Law Dictionary 331 (9th ed. 2009). A reasonable construction of Dr. Ferguson's and Dr. Gallon's use of the word "concurrently" in their reports is that Dr. Stephenson was to be available for the usual post-operative care of Miller and that he was to be responsible for the post-operative management of Miller along with the nephrologists. Thus, any references in the report to a joint standard of care involving the post-operative management of

11

Miller would be appropriate. *See, e.g.*, *Barber v. Dean*, 303 S.W.3d 819, 831 (Tex. App.—Fort Worth 2009, no pet.). The excerpts above show that both Dr. Ferguson and Dr. Gallon concluded and opined that under Harris's Protocol, as well as prevailing standards of care for post-operative care and management of a patient, the transplant surgeon was responsible for both post-operative care and management of a patient like Miller. Both reports clearly state that the articulated standards of care are applicable to both Dr. Stephenson and the nephrologists; Dr. Ferguson's report also states how Dr. Stephenson as well as the nephrologists breached that standard. Thus, the expert reports proffered by appellees fulfill their statutory purpose: to provide enough information within the document to both inform the defendant of the specific conduct at issue and to allow the trial court to conclude that the suit has merit. *See Bowie Mem'l Hosp.*, 79 S.W.3d. at 52.

We overrule appellant's first issue.

**Causation**

Appellant further contends that Dr. Ferguson's and Dr. Gallon's reports are deficient because they are conclusory and "also lump all physicians and defendants together for causation."

Appellant contends that appellees' experts failed to explain how he is linked to Miller's cardiac arrest, which occurred during ultrafiltration by Dr. Khan, the nephrologist. According to appellant, the court must make improper inferences to "glean precisely how it is that the care of Appellant Dr. Stephenson

12

himself . . . caused the death of the patient."  He contends Dr. Gallon's report

fails for the same reason because it is "not surprisingly identical to [that] of Dr.

Ferguson."

Dr. Ferguson opined as follows:

> Had their own Protocol been implemented, or the community standard cited above, Steve Miller's post-operative bleeding and hyperkalemia would have been detected at a much earlier time allowing much earlier treatment.
>
> . . . .
>
> 3.    The critical potassium value indicating the hyperkalemia condition that could immediately cause a patient to develop life-threatening arrhythmia required aggressive treatment as soon as that condition was diagnosed by the blood sample that was drawn at 3:40 a.m. . . . [A]t 7:25 a.m., on 4/3/07 . . . Steve Miller's condition was extremely critical and life-threatening.  Mr. Miller's kidney had produced very little urine (oliguria) and the hematocrit and hemoglobin values indicated an internal hemorrhage. . . .
>
> 4.    . . . The ultrafiltration removed fluid volume from Steve Miller who was already presenting with a compromised hypovolemic condition, and was the finishing catalyst in Steve Miller's hemodynamic[5] collapse and a contributing cause to his death at 11:27 a.m. on 4/3/07.
>
> . . . . Due to the cumulative effect of the negligent care, aggressive medical management of the hyperkalemia, followed by an operation to control bleeding or intraoperative dialysis, with life-support measures, accompanied by surgical repair of the postoperative bleeding, were at the time, (7:25 a.m.), the only heroic and plausible interventions to save the life of this 24 year-old young man.
>
> . . . .

---

[5]Hemodynamic means "[r]elating to the physical aspects of the blood circulation."  *Id*. at 868.

13

. . . [Miller] died of a cardiac arrest while in dialysis in a state of uncontrovertible ventricular tachycardia. . . . He experienced postoperative bleeding that caused dangerous hyperkalemia. A decision to use dialysis to treat the life threatening hyperkalemia, rather than, or in addition to, aggressive medical management, was made. While on dialysis, ultrafiltration led to hypotension as it frequently does in the early post-transplant dialysis setting and definitely does in a compromised hypovolemic post-surgical state. This was not recognized, but in fact, more fluid volume was removed by ultrafiltration that exacerbated rather than improved the hypotension and hypovolemic, thus setting up an environment of uncorrected hyperkalemia (repeat potassium in dialysis of 7.9), acidosis (arterial pH of 7.166), hypotension, hypovolemic, hypoxia, and ventricular tachycardia. Given this setting and environment, it is not surprising that the ventricular tachycardia could not be successfully reversed and became the ultimate cause of death.

. . . .

Each of the standards of care as I have indicated above was a proximate cause of the death of Steve Miller. . . . Earlier, had he received the proper treatment, Steve Miller, in all reasonable medical probability, would have resulted in his being able to survive the post-operative bleeding. . . . The failure to properly treat Steve Miller's condition by Rubina Khan, M.D., Shane Kennedy, M.D., Gerald Robert Stephenson, M.D. and Patricia Fenderson, M.D. [the Director of Harris Methodist Hospital – Fort Worth], combined with the failure of the nurses and health care providers . . . all of which . . . caused Steve Miller to ultimately go into cardiac arrest from which he could not be resuscitated, thus, causing his death. Each of the above violations of the standard of care was a proximate cause of Steve Miller's death.

Earlier in his report, Dr. Ferguson faults Dr. Stephenson for breaching the following standards of care: failing to ensure the Protocol was implemented as to timely CBC and BMP laboratory tests, failing to ensure that Dr. Khan's "now" order for calcium gluconate was immediately processed, failing to diagnose and treat the primary cause of Miller's hyperkalemia, which was the postoperative

14

bleeding, and allowing Dr. Khan to order ultrafiltration when it was not indicated. In his report, he states that had the Protocol been implemented, Miller's hyperkalemic condition would have been evident earlier and would not have eventually progressed to ventricular tachycardia. According to Dr. Ferguson, Dr. Stephenson's failure to diagnose the underlying cause of Miller's hyperkalemia and his allowing the ultrafiltration exacerbated that continuing hyperkalemic condition, which eventually led to irreversible ventricular tachycardia. Dr. Ferguson's report describes a chain of omissions that each had the effect of further exacerbating Miller's condition until it became irreversible. *See, e.g.*, *Menefee v. Ohman*, 323 S.W.3d 509, 519–20 (Tex. App.—Fort Worth 2010, no pet.); *Presbyterian Cmty. Hosp. of Denton v. Smith*, 314 S.W.3d 508, 518–19 (Tex. App.—Fort Worth 2010, no pet.); *see also Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010) (holding that there may be more than one proximate cause of an event).

Accordingly, we conclude and hold that Dr. Ferguson's opinions on causation are not conclusory, nor do they fail for lack of specificity as to Dr. Stephenson, with respect to each of the alleged standard of care violations except for the failure to ensure the timely administration of calcium gluconate or insulin. Dr. Ferguson does not explain how that failure was a proximate cause of Miller's death. However, Dr. Gallon states in his report that intravenous calcium gluconate would "stabilize the myocardium" and an insulin/glucose combination would "treat the hyperkalemia." Thus, reading both reports together, the alleged

15

failure to ensure the timely administration of the proper medication was another omission in the chain that led to the exacerbation of Miller's hyperkalemia and ultimate cardiac arrest. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(i); *Davisson v. Nicholson*, 310 S.W.3d 543, 558 (Tex. App.—Fort Worth 2010, no pet.) (op. on reh'g); *Packard v. Guerra*, 252 S.W.3d 511, 526–27 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (holding that we must review multiple reports "in the aggregate" to determine if they are adequate as to liability and causation).

We conclude and hold that the trial court did not abuse its discretion by determining that the expert reports proffered by appellees constituted a good faith effort to comply with the statute. We overrule appellant's second issue.

## Conclusion

Having overruled both of appellant's issues, we affirm the trial court's order.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; MEIER, J.; and DIXON W. HOLMAN (Senior Justice, Retired, Sitting by Assignment).

DELIVERED: July 28, 2011